## MAXFIELD et al. v. PURE OIL CO. et al.

### No. 11878.

Court of Civil Appeals of Texas. Dallas.

Jan. 25, 1936.

Rehearing Denied March 14, 1936.

Wynne & Wynne, of Wills Point, and Vinson, Elkins, Sweeton & Weems and David T. Searls, all of Houston, for appellees.

BOND, Justice.

This suit was instituted by J. S. Maxfield and his daughter, Pauline Maxfield Shirley, joined by her husband, against the Pure Oil Company and others, in trespass to try title to a small tract of land in Van, Tex.; and, also to recover damages for conversion of oil from an oil well drilled on the premises.

The case was tried before a jury; but, at the conclusion of all the testimony, the trial court, on motion of the defendants, instructed a verdict in their favor, and accordingly entered judgment.

The questions raised before this court on appeal are the same questions which were before the trial court at the time the various defendants filed motions for an instructed verdict, that is, whether the Pure Oil Company, the owner and holder of an oil and gas lease on the land, and E. V. Tunnell, the owner and holder of the title in fee, and their immediate predecessors in title, respectively, are innocent purchasers as against plaintiffs' unrecorded deed. The questions turn on whether there is sufficient evidence as to put the defendants and their grantors, as a matter of law, on notice as to J. S. Maxfield's right under an unrecorded deed from his father, N. S. Maxfield, dated in 1906 and recorded in 1930, and, alternatively, whether the evidence raises an issue of fact requiring of the defendant Tunnell, or his grantor, M. R. Bolin, to make inquiry of J. S. Maxfield as to his title, and whether such inquiry would lead to the disclosure of Maxfield's claim; thus, an affirmative finding would defeat the purchaser's claim of being an innocent purchaser for value.

It may be conceded that, if the defendant E. V. Tunnell is not an innocent purchaser of the land, or, his predecessor in title, M. R. Bolin, was not an innocent purchaser, then the evidence conclusively establishes the plaintiffs' title in fee; on the other hand, if, as a matter of law, the defendant Tunnell, or his grantor, both or either of them, were innocent purchasers, then the evidence establishes the title in E. V. Tunnell. The evidence is conclusive that the Pure Oil Company's rights in the land do not depend on the question of inno-

C. S. Farmer and Geo. W. Barcus, both of Waco, for appellants.

cent vestiture of title in Tunnell, nor in Bolin; the Pure Oil Company is an innocent purchaser of an oil and gas lease on the land without notice of the plaintiffs' title under an unrecorded deed; and no fact is shown as to put it on inquiry of plaintiffs' alleged claim of title.

The record reveals that in 1906 N. S. Maxfield, the owner and holder of a large tract of land, and on which he lived, conveyed to his son, J. S. Maxfield, the small lot in question, adjacent to the larger tract. The deed was not recorded in the deed records of Van Zandt county, where the land was located, until 1930, after the discovery of oil at Van. In 1908, J. S. Maxfield, while living as a member of his father's family, on the larger tract of land, erected a small building on the lot and thereafter conducted therein a barber shop and mercantile business, selling pianos or organs, until the building burned in 1909. Soon after the building was destroyed, J. S. Maxfield moved out of the county and did not return until December, 1910. In 1911, J. S. Maxfield again made his home with his father, cultivated a crop on his father's farm, making no use of the lot in question. The lot was vacant, except some charred remains of the fire; and no evidence of demarcation existing to designate the lot from the adjoining lands.

In the fall of 1911, N. S. Maxfield approached M. R. Bolin to sell all the lots which he claimed to own in the vicinity of the stores at Van, including the one in question. Mr. Bolin testified, in effect, that he did not know that any one claimed the lot except N. S. Maxfield; that N. S. Maxfield did claim it; that he purchased the lots from him for the sum of $50; and, that, on November 21, 1911, N. S. Maxfield executed and delivered a deed therefor. Thereafter, on January 5, 1912, M. R. Bolin conveyed the lot, with the adjacent land, amounting to about seven acres, to E. V. Tunnell. E. V. Tunnell and Mr. Bolin, at the time of their respective purchases, each knew of J. S. Maxfield building the house and his occupancy thereof, and knew that the house burned. Mr. Bolin testified that he did not know who collected fire insurance on the building, but that J. S. Maxfield did tell him, either before or after the fire, that he had insurance.

The testimony of both Bolin and Tunnell is to the effect that there was no rubbish or anything located on the lot in controversy at the time of the respective purchases by them. However, if we consider the most favorable testimony to plaintiffs, it must be conceded that the only thing located on the lot at the time of purchases by Bolin and Tunnell was the rubbish, "screwpins, castings and springs," which resulted from the destruction of the building and the organs by fire; and, that J. S. Maxfield had never made any use of the lot after the building was destroyed. The "screw-pins, castings and springs," débris resulting from the fire, were removed by J. S. Maxfield in 1913.

The Pure Oil Company deraigned title to a leasehold estate under an oil and gas lease from E. V. Tunnell to E. G. Lewis, dated June 28, 1927, and which was assigned to the Pure Oil Company on July 12, 1927. Its claim of being an innocent purchaser for value is not challenged by evidence; and the issue as to the alleged damages sustained by plaintiffs, resulting from the flow of oil from an alleged oil well on the lot, arises only on the status of Tunnell's title and as to the location of the oil well on the lot in question. The situs of the well is a disputed issue. The undisputed evidence discloses that the Pure Oil Company paid a valuable consideration for the lease covering the lot in question, that it had no actual notice of the unrecorded deed held by J. S. Maxfield, and that the lot was vacant at the time of the assignment.

The contention of the appellants is that neither E. V. Tunnell nor M. R. Bolin were innocent purchasers of the lot in question, because they purchased with notice of J. S. Maxfield's construction and occupancy of the house on the lot in 1908 and 1909, and, at the time of their respective purchases, in 1911 and 1912, the débris was on the lot; therefore, the lot was in the actual possession of the appellants and sufficient to put the purchasers on notice of appellants' title under the unrecorded deed, or, at least, such possession was sufficient to raise an issue for the determination of a jury, as to whether the purchasers should have made inquiry of J. S. Maxfield, which inquiry would have led to the disclosure of plaintiffs' title.

■■ The rule is well settled, we think, that a purchaser who pays a valuable consideration and purchases land without notice of the rights of another under an unrecorded deed is an innocent purchaser and acquires the superior title; and, it is equal-

ly well settled that a purchaser of land, with notice of the rights of another, under an unrecorded deed, is not an innocent purchaser. Possession, in order to constitute notice, must be actual present possession of the party, or his agent or tenant, consisting of acts of occupancy which are open, visible, and unequivocal, and not mere constructive possession.

 It must be observed that J. S. Maxfield, at the time he constructed the building and occupied it, was then living with his father, N. S. Maxfield, on land near to and adjacent to the lot in question; and, after the destruction of the house by fire, nearly two years thereafter, N. S. Maxfield, on inquiry being made of him by the purchaser, stated he owned the lots and wanted to sell them. The lots were vacant, apparently a part of the larger tract on which N. S. Maxfield resided. Such, we think, point consistently to N. S. Maxfield as the actual possessor of the lot at the time of the purchase by Bolin, and the purchaser was justified in making inquiry of him instead of seeking information of J. S. Maxfield. Furthermore, we think the possession of J. S. Maxfield in 1908 and 1909 is not inconsistent with the appearance of the lot in 1911 and 1912 as being in the possession of N. S. Maxfield; or, his prior possession imposed on the purchaser a duty to make inquiry of him. "Possession is notice only during its continuance. The possession which suggests inquiry to a purchaser, and is notice to him of the possessor's interest in the land, is a possession which exists at the time of the purchase and is not casual, occasional, or for a special or temporary purpose. A former possession which has ceased does not impart notice nor impose on the purchaser a duty to inquire of the late occupier as to the nature of his title." Corpus Juris, vol. 66, pp. 1171, 1172.

In O'Neal et al. v. Prestwood (1907) 153 Ala. 443, 45 So. 251, 252, Mrs. Tompkins claimed title under an unrecorded deed from her father. She contended that subsequent purchasers had notice of her claim by reason of her possession of the property at a time prior to their purchase. The court said: "If we assume that Mrs. Tompkins, through tenants or otherwise, up to the year 1889, had possession of the lot, and that Watson was not jointly with her exercising acts of ownership—an assumption really refuted by the testimony ad-duced in this cause—such status would not operate to charge the county as the purchaser in October, 1897, eight years afterwards, with the duty to inquire what her rights were at that time. Time nearly sufficient to create a bar by prescription had elapsed. The land had been vacant for years before the purchase by the county, and Watson had repeatedly and in the most solemn manner asserted his ownership of the premises and asserted the dominion of it as far as that state would permit. In Boggs v. Varner, 6 Watts & S. (Pa.) [469] 474, the Pennsylvania court, writing to the point before us, says: ' * * * For, if the possession is vacant, it supersedes the necessity of further inquiry; for no case has been ruled which extends the doctrine of constructive notice so far as to visit him with all the consequences of notice, because he may have known a person to have been in possession at any distant period of time before his contract. The law is not so unreasonable. * * *' To the like effect is Meehan v. Williams, 48 Pa. 238; Roussain v. Norton, 53 Minn. 560, 55 N.W. 747. The same principle is recognized in Scotch Lumber Co. v. Sage, 132 Ala. 598, 32 So. 607, 90 Am.St.Rep. 932."

In Roussain et al. v. Norton (1893) 53 Minn. 560, 55 N.W. 747, 748, it was claimed that there was evidence of a prior possession at the time of a subsequent purchase, but that such prior possession was insufficient to place the subsequent purchasers on notice of the claim of the prior purchaser under an unrecorded deed. The court said: "To charge a purchaser with notice of the rights of others than his grantor by the mere fact of possession, the possession must be a present one. A former possession, which has ceased, will not suffice, although there be evidence of its having existed still apparent on the land. The question in such case is not what was the condition as to possession, or the indication of possession, years before, but what was such condition and indication at the time of the purchase or during the negotiations ending in it. In this case there was no one resident on the land. Nor is that necessary where, in lieu thereof, the party claiming an interest in the land is exercising acts of dominion over it, such as leaves on the land indications of not mere casual entries, but a continued claim of right to it."

In the case of Jackson v. De Guerin et al., 124 Tex. 424, 77 S.W.(2d) 1041, 1042,

Jackson claimed under an unrecorded instrument. Falvey and Rushing held a mineral lease from De Guerin and claimed to be innocent purchasers without notice of the unrecorded instrument. At the time of the purchase, Jackson was living on a farm which adjoined the tract in question. Jackson testified that he reconstructed part of the fence on one side of the 50-acre tract and put about 30 acres of it into cultivation and raised cotton upon it in 1930, and, on October 4th, 1930, the mineral lease was executed. The Commission of Appeals, adopted by our Supreme Court, said: "There is no higher type of physical facts to denote actual possession of a given tract of land than a growing crop; but, standing alone, the possession thus revealed is insufficient to put a purchaser on an inquiry. A purchaser would be justified in assuming that the possession is that of the holder of the record title, unless the visible circumstances attending the possession at the time be of such import as to indicate distinctly, to a prudent observer, a different possessor. Paris Grocer Co. v. Burks, 101 Tex. 106, 105 S.W. 174. Counsel for Jackson rely on Collum v. Sanger Bros., 98 Tex. 162, 82 S.W. 459, 83 S.W. 184, and Ramirez v. Smith, 94 Tex. 184, 59 S.W. 258, as support for the proposition that a purchaser is not relieved of making inquiry of the possessor, merely because the possession is consistent with the record title. Counsel overlook the distinguishing feature of those cases. In each of them the appearances on the land pointed to the possessor. The possessor was actually residing on the land. Plainly a purchaser would not be justified in assuming that a person is not in possession of the land upon which he resides."

In Aurelius v. Stewart (Tex.Civ.App.) 219 S.W. 863, 865, Stewart claimed title under an unrecorded contract of sale; Aurelius claimed he was an innocent purchaser. Stewart fenced the land, and in 1918 used the land as a pasture, but at the time Aurelius obtained the mineral lease, in 1919, no stock was grazing on the land. The Fort Worth Court of Appeals said:

"It is not shown that the 155-acre tract was within the same inclosure as the rest of Stewart's ranch, nor even that it was adjacent thereto, nor that any cattle were grazing on it at this particular time of the year, though it was used as pasture land by Stewart during 1918. * * *

"As before stated, while it is shown that the premises were fenced, there is nothing in the evidence to show that they were so connected with the ranch of the plaintiff as to impose on a prospective purchaser, as a matter of law, the duty to make inquiry of the occupant of appellant's ranch house, in order that such purchaser might be held free from the imputation of a lack of due diligence."

See, also, Tolar et al. v. South Texas Development Co. et al. (Tex.Civ.App.) 153 S.W. 911; Paris Grocer Co. et al. v. Burks et al., 101 Tex. 106, 105 S.W. 174; Ball v. Norton (Tex.Com.App.) 238 S.W. 889.

 Reviewing the authorities in the light of testimony in this case, we are of the opinion that knowledge of the prior possession of J. S. Maxfield, at a time when he was living with his father, was not sufficient to place Bolin or Tunnell on notice that the father did not have title at the time of the conveyance to Bolin in 1911; or, that such knowledge, with the débris on the ground, did not impose on Bolin, or Tunnell, a duty to inquire of J. S. Maxfield as to the nature of his title, in order that such purchasers might be held free from the imputation of a lack of due diligence.

 We conclude that, as appellants do not contend that there was any actual notice to the lessee, E. G. Lewis, or to his assignee, the Pure Oil Company, and do not contend that there was any possession of the lot in question, or any evidence of a former possession at the time of the lease to Lewis and the subsequent assignment to the Pure Oil Company, it is inevitable that Lewis was an innocent purchaser for value and without notice of the claim of J. S. Maxfield under his unrecorded deed; therefore, the Pure Oil Company must be protected as having acquired title from an innocent purchaser. Moreover, the Pure Oil Company is to be protected because it is also an innocent purchaser for value. Furthermore, the testimony is conclusive that M. R. Bolin and E. V. Tunnell, the immediate grantors of Lewis, were innocent purchasers of the title in fee, therefore, Tunnell, the owner of the fee, the assignee of the leasehold estate, and the royalty owners are to be protected in their title and from alleged damages resulting by the flow of oil from the well alleged to have been drilled on the premises.

The judgment of the lower court is affirmed.

## On Motion for Rehearing.

The appellants, on motion for rehearing, challenge the findings in the original opinion, wherein it stated that "In 1906, N. S. Maxfield, the owner and holder of a large tract of land, and on which he lived, conveyed to his son, J. S. Maxfield, the smaller lot in question, adjacent to the large tract"; and, further, "In 1908, J. S. Maxfield, while living as a member of his father's family on the larger tract of land, erected a small building on the lot"; and still further, "In 1911, J. S. Maxfield again made his home with his father, cultivated a crop on his father's farm."

In deference to the vigorous attack, in motion and oral argument, an extended examination of the voluminous statement of facts has again been made, and we think the facts revealed therein justify the conclusions reflected in the opinion:

J. S. Maxfield testified that he owned 76.8 acres of land near and adjacent to the village of Van, Tex.; that he sold the land to his father, N. S. Maxfield, and, in 1906, his father reconveyed to him a lot (the lot in question) out of the tract, and, in the fall of 1906, the balance of the tract was sold to A. G. Maxfield. He was then questioned and answered, as follows:

"Q. This lot that is in controversy here is a part of your father's homestead? A. No, sir * * *.

"Q. How far was his residence from the tract of land that this block was a part of? A. Three or four hundred yards.

"Q. Did he own all the land from there to his house? A. No, sir.

"Q. Is there a break in it up there somewhere? A. Yes, sir."

The record reveals that, in January, 1909, A. G. Maxfield reconveyed the land he purchased to N. S. Maxfield. M. R. Bolin testified, questioned, and answered, as follows:

"Q. Where was Newt (N. S.) Maxfield living? A. He lived at Van.

"Q. So then, from 1904 and 1905, along in there sometime, or down to 1909 or 1910, you know they both lived there close around?

"A. I don't think Jacie (J. S. Maxfield) was there all the time, * * * and I think he stayed with his father in and out. I didn't make any minutes of these things.

"Q. Where did J. S. Maxfield live when he was in Van? * * * Did he have a house or residence when he was operating the barber shop? A. I think he was living with his father. * * *

"Q. You know where Mr. J. S. Maxfield was at the time you bought those lots from Mr. N. S. Maxfield (November 11th, 1911)? A. I do not.

"Q. Was he at Van at that time? A. I think he was there. That is my recollection; that he made a little crop upon the old Maxfield place.

"Q. Where was he living at that time? A. His home was with his father, I think.

"Q. N. S. Maxfield, the man you purchased the lot from? A. Yes, sir, I think it was his home.

"Q. How far did he live from that lot? A. Right across the gin lot, I suppose about an acre in the gin lot.

"Q. Right up there where young Charlie Cannon's place was? A. About 200 yards over there."

E. B. (Bunnie) Tunnell testified:

"Q. Do you know whether or not during the time you have known the lot (lot in question) a building, an organ house, or something like that was located on the lot? A. Well, no; at that time, it wasn't a lot; there was a little organ house built there, however. It wasn't at that time known as a lot. Mr. N. S. Maxfield owned all of that land there at that time, and there was a lot—

"Q. Go ahead. A. Well, and E. V. Tunnell later bought it. Then it was known as lots after he bought it; he bought seven acres, I believe it was."

The testimony of the witness above quoted is uncontradicted, and we fail to see any serious conflict with the findings reflected in the original opinion, of which the appellants complain; and, in passing, we reaffirm that, at the time M. R. Bolin purchased the property, the facts show and appearances of the lot point consistently to N. S. Maxfield as the actual possessor of the lot, and that the purchaser, M. R. Bolin, was justified in making inquiry of him, instead of seeking information of J. S. Maxfield as to the ownership thereof.

Furthermore, it is inconceivable that a son living with his father in a country village, as Van was at that time, did not know that his father, N. S. Maxfield, an honorable and upright citizen, was then claiming the lot in question, and that he sold the lot to one of his neighbors, M. R.

Bolin, and, further, the son, for practically twenty years thereafter, living in that community, was ignorant of those facts, and, after oil had been discovered on and near the lot, in 1930, for the first time discovered that the lot had been sold by his father; that his neighbor had purchased it and sold it to another neighbor, E. V. Tunnell, who has been holding the property adversely to the son's rights therein under an unrecorded deed.

We see no reason to change the findings and conclusions of the original opinion; therefore, the motion for rehearing is overruled.

Motion overruled.